**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN (WATERLOO) DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>NICHOLAS RYAN ACOSTA,<br><br>        Defendant. | No. 18-CR-2050-CJW<br><br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

<u>Page</u>

I.    **INTRODUCTION**................................................................ 3

II.   **SUMMARY OF THE EVIDENCE**...................................... 3

    *A.*    *The Stop* ......................................................... 3

    *B.*    *Officer Johnson and Duke*...................................... 7

    *C.*    *Duke's Training Records*......................................... 9

    *D.*    *Midwest K-9 and Dogs for Law Enforcement*...............12

    *E.*    *Hancock County Deputy Sheriff and K-9 Handler Andrew Klein*........12

    *F.*    *Dog Trainer Jim Stenfeldt* ......................................14

    *G.*    *Cuing*..............................................................17

**III.    ANALYSIS** ...................................................................19

    **A.    *The Parties' Arguments*** .........................................19

    **B.    *The Warrantless Search of Defendant's Vehicle*** .............20

        **1.    *The Automobile Exception*** ..............................20

        **2.    *Was There Probable Cause to Search the Vehicle Before the Sniff?*** .......................................21

        **3.    *Did the Sniff Establish Probable Cause?*** ............21

            **a.    *Applicable Standards*** ...........................21

            **b.    *Did Duke alert?*** .................................22

            **c.    *Duke's Certification*** ............................23

            **d.    *The presumption of reliability based on certification was undetermined*** .............. 26

                **i.    *The absence of standards or policies regarding NPD Dogs*** ...............27

                **ii.    *The absence of records*** ................28

**IV.    CONCLUSION** ........................................................ 33

# I.    INTRODUCTION

The matter now before me is Defendant's Motion to Suppress Evidence. (Doc. 19.) On September 11, 2018, the Grand Jury charged Defendant with Possession of a Firearm by a Drug User. (Doc. 2.) The charges arose from a traffic stop and a canine search of Defendant's vehicle that occurred on June 10, 2018.

The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation. On December 12, 2018, I held an evidentiary hearing on Defendant's motion ("the hearing"). The Government called the following witnesses:

- Former Nashua, Iowa Police Officer Stephen Johnson[1];

- Nashua, Iowa Reserve Police Officer Daniel Moore; and

- Hancock County, Iowa Deputy Sheriff Andrew Klein.

Defendant called Jim Steinfeld.

For the following reasons, I respectfully recommend that the Court **Grant Defendant's Motion to Suppress.**

## II.    SUMMARY OF THE EVIDENCE

### A.    *The Stop*

At 1:30 a.m. on June 10, 2018, Officer Stephen Johnson and Reserve Officer Daniel Moore were running a stationary radar detector at mile marker 220 on Highway 218 near Nashua, Iowa when they detected a silver Chevy Silverado pickup truck ("the pickup") traveling at 95-miles-per-hour.[2] (Hr'g Tr. at 16-18.) Officer Johnson was then a patrol officer, field trainer, and K-9 handler for the City of Nashua, Iowa Police

---

[1] Officer Johnson has since become employed by the Chickasaw County Sheriff's Department as a patrol officer and K-9 handler. (Hr'g Tr. at 5.)

[2] The speed limit is 65-miles-perhour in this area. There is no challenge in this case to the validity of the stop based on the detected speeding violation.

Department ("NPD").  (*Id.* at 6.)  With the officers was Duke, the NPD's sole patrol and drug detection dog, who was handled by Officer Johnson.  Duke was the City's first and only K-9. (*Id.* at 96.)

When the officers detected the speeding violation, they initiated a traffic stop by activating their flashing lights, catching up to the vehicle, and pulling it to the roadside. (*Id.* at 19.)   Officer Johnson's body camera and microphone, as well as the police vehicle's dash camera, captured the events that followed.  (Ex. 7, 8.) Both officers initially approached the pickup and decided to issue a citation.  (*Id.* at 20.)  While Officer Moore was preparing the citation, the two officers were seated in the patrol car and discussed whether to deploy Duke.  (*Id.* at 82-83.)  As captured by the audio and as Officer Johnson testified, at this point Defendant did not seem nervous and was "clean." (*Id.* at 82.) The only apparent justification for deploying Duke was Officer Moore's statement that Defendant's pickup was "a perfect vehicle to transport." (Ex. 7 at 5:45.)

The Government played portions of Officer Johnson's body camera video at the hearing and Officer Johnson was asked questions about the video and narrated what the video showed.   Officer Johnson commenced the search at the downwind side of the pickup, in this case the rear of the vehicle. (Hr'g Tr. at 22.)   Officer Johnson "cast" Duke to let him work independently to see if he picked up any scent before he started "detailing," that is, pointing to where he wanted Duke to sniff.  (*Id.*)   The point of detailing is to keep the dog engaged and his attention where the officer wants it.  (*Id.* at 23.)  It is common for a dog to be distracted by other odors by the side of a highway. (*Id.*)  In this case, Duke became distracted by what Officer Johnson suspected was an animal odor under the pickup. (*Id.*; Ex. 7 at 9:24.)  Duke's tail straightened and he tried to go under the driver's side of the pickup.  The tail straightening is a behavior that Officer Johnson "just know[s]" means Duke is smelling an animal. (Hr'g Tr. at 24.) Officer Johnson testified this behavior did not indicate Duke was smelling any controlled

substance. (*Id.*) On the contrary, Duke's tail wags when he smells a controlled substance because he is excited and he will get his reward, a cloth tug toy. (*Id.* at 25.) In addition to the tail wagging, when Duke notices a controlled substance he also engages in closed-mouth breathing and "bracketing" of the area. (*Id.*) Officer Johnson also testified that Duke is a passive alert dog who sits when he alerts to the presence of a controlled substance. (*Id.* at 10, 34.) During the sniff,[3] Officer Johnson spoke to Duke repeatedly[4] after telling him, "Find dope." (Ex. 7 at 8:37- 9:50.)

While watching the body camera video in court, Officer Johnson described how Duke began closed-mouth breathing and start to bracket the vehicle without the officer detailing him. (Hr'g Tr.at 29; Ex. 7 at 9:30-:48.[5]) Officer Johnson believed he could hear the difference in Duke's breathing at this point. (Hr'g Tr.at 29.) Officer Johnson testified that at 9:47 of the video, Duke sat, an action that he interpreted as an alert to the odor of a controlled substance. (*Id.*) In reviewing the video from the patrol car's dash camera, it appears to me that Duke sniffed the top of the pickup's bed cover on the driver's side rear of the vehicle and then went into a sitting position. (Ex. 8 at 10:11-:13.) Officer Johnson testified he then kept Duke working along the passenger side of the vehicle after the alert to be sure he covered the entire vehicle. (Hr'g Tr. at 30-31.)

While reviewing the dash camera video at the hearing, at 10:09, Officer Johnson stated Duke was bracketing the area. (*Id.* at 33.) At 10:30 of the dash camera video, Officer Johnson testified that he was "detailing," i.e., pointing to where he wanted Duke

---

[3] "Sniff" seems to be the common parlance for a dog's olfactory inspection from when it is commanded to begin until it either alerts to the presence of contraband or the handler decides to end the process.

[4] Officer Johnson said such things as, "Leave it," "Find dope," "What are you looking at?" "Here, come here," "Good boy," and, when Duke was distracted by the animal scent, "What are you digging under there for?" (Ex. 7 at 8:37-9:50.)

[5] Deputy Klein also testified he saw closed-mouth breathing and bracketing in the video. (Hr'g Tr. at 156.)

to sniff. (*Id.*) In addition, during the process, Officer Johnson communicated with Duke with statements such as, "*Let's go, come on, find dope, come on, come on.*" (*Id.*) After the alert, Officer Johnson continued to detail the pickup, including by tapping on it at specific places. (*Id.* at 34.) Officer Johnson testified that he did not tap the pickup in the area where Duke alerted (i.e., at the tailgate) before Duke alerted. (*Id.* at 35.) Although Officer Johnson continued to detail the pickup after Duke's alert, he concluded he had probable cause to believe there were narcotics present based on Duke's alert. (*Id.* at 35-36.) Officer Johnson returned Duke to the police vehicle and praised him. (*Id.* at 71-72; Ex. 7 at 11:22.)

The officers searched the pickup and found a green leafy substance believed to be marijuana in the rear passenger compartment of the vehicle. (Ex. 9.) The officers also found two white Alazopram tablets, one tablet of MDMA or ecstasy, a cigarillo packet apparently containing marijuana, two gummies believed to contain THC, two tablets of Adderall, and a capsule containing an unknown white powder. (*Id.*) An unloaded handgun was located in the glove-box. (*Id.*) Defendant was arrested and the pickup was towed and impounded. The officers found an additional Adderall tablet in Defendant's pocket when they searched him for booking. (*Id.*) After obtaining a search warrant, the officers' further search disclosed ammunition and firearm accessories in a locked toolbox in the bed of the pickup. (*Id.*) The officers also located approximately 500 empty plastic bags in the pickup bed and a vapor pen believed to contain THC in the pickup's center console. (*Id.*)

No drugs were found in the bed of the pickup. (*Id.* at 38.) Officer Johnson testified, however, that the odor of narcotics can remain after the drugs themselves are no longer present because it can "stick to certain materials." (*Id.*)

## B. *Officer Johnson and Duke*

Officer Johnson had been with the NPD since 2014. He attended the Iowa Law Enforcement Academy and has an AA in criminal justice from Hawkeye Community College. (Hr'g Tr. at 6.) He had previously been employed as a reserve officer with the Winnebago County Sheriff's Office for six months. (*Id.* at 7.) He has been a K-9 handler since February 2017. (*Id.*) Duke is his first dog as a K-9 handler. (*Id.* at 8.) Duke is a rescue dog with an unknown background who was approximately one-year-old when Officer Johnson obtained him. (*Id.* at 40.) He had not been assigned to any handler prior to Officer Johnson. (*Id.*) Duke lives with Officer Johnson. (*Id.* at 41.) In addition to drug detection, Duke is trained for tracking and area searches. (*Id.* at 79-80.)

At the time of the stop in question, Officer Johnson was the only dog hander with the City of Nashua and Duke was the City's only dog. (*Id.* at 69.) The NPD has not adopted any standards or regulations regarding Duke's training or record keeping. (*Id.* at 73.) Rather, Officer Johnson "goes by" what his trainer told him to do. (*Id.*) The NPD has no performance standards for Duke or any policy regarding removal of a dog from service. (*Id.* at 74.)

On February 17, 2017, Officer Johnson and Duke successfully completed a four-week handler course conducted by Midwest K-9 ("MK9"). (*Id.* at 7, 41.) Prior to this course, Duke had been imprinted by Dennis George of MK9.[6] (*Id.* at 8-9; Ex. 1.) Officer Johnson did not receive any records from MK9 about Duke from before he took possession of him. After completing the MK9 training, Duke began accompanying Officer Johnson regularly on patrol where he was deployed approximately once per week. (Hr'g Tr. at 11.) Officer Johnson testified he generally trains with Duke sixteen hours per month. (*Id.* at 69.)

---

[6] Imprinting is the initial training to familiarize dogs with the smells they are meant to detect and to motivate them to detect those substances for a reward.

Initially, Officer Johnson conducted training with confiscated drugs, some of which had not been tested by the Iowa Division of Criminal Investigation lab. (*Id.* at 59.) Officer Johnson was unsure regarding the appropriate standard for how long drugs should be used for training before replacing them. (*Id.* at 60.) He stores training drugs in glass jars in a locked container and places them in a locker. (*Id.*) Approximately two months after completing the MK9 training, Officer Johnson began training with a group called Dogs for Law Enforcement ("DLE") on a "semi-regular" weekly basis. (*Id.* at 7, 11-12.) This training consists of searches and tracking. (*Id.* at 12.)

In May 2018, Officer Johnson and Duke completed a 40-hour course of training and were tested and certified for narcotics detection by DLE. (*Id.*; Ex. 2, 3).[7] Some of that 40 hours was spent on classroom training. (Hr'g Tr. at 45; Ex. 4.) The DLE "Narcotics Certification Sheet/Audit Sheet" shows Duke passed the odor recognition tests for cocaine, heroin, marijuana, and methamphetamine. (Ex. 4.) Duke also passed the vehicle search test, although the trainer commented, "Trust the dog!" (*Id.*; Hr'g Tr. at 46). The trainer, Deputy Sheriff Andrew Klein, whose testimony is discussed below, stated this comment was made because Officer Johnson continued to run his dog around vehicles that did not contain drugs. (Hr'g Tr. at 118.) This concerned the trainer because it might result in "generating a false [positive] out of his dog." (*Id.*) He continued,

> when he went around the one vehicle where the hide was, the dog hit it right away. He went around the other vehicles two more times and basically I told him "If your dog is telling you there's nothing there, you need to trust that and just move on."

(*Id.* at 118-19.)

---

[7] Duke's second certification was more than 12 months after his first. Deputy Klein testified that the standard is to be recertified within a year, but there is "wiggle room." (Hr'g Tr. at 162.) Like other aspects of the dog certification world, there is no generally accepted or legally mandated standard.

Duke also passed a building search test for narcotics and a tracking test. Duke was not tested for marijuana as part of the "vehicle search test" in this certification. (*Id.* at 46.) As part of the building search test, Duke found "hides" containing cocaine, heroin, marijuana, and methamphetamine. (Ex. 4.) The test record does not show weather conditions. (*Id.*) Although Duke normally wears an electric collar for obedience (Hr'g Tr. at 47), it is not clear if Duke was recertified by DLE while wearing his electric collar. While dogs are permitted to wear electric collars during DLE testing, the tester takes the collar control from the handler. (*Id.* at 142-43.) Deputy Klein estimated that 10 to 15 percent of dogs fail to become certified after a 40-week course. (*Id.* at 150.) If a dog fails a vehicle search test, the dog can be retested the following day. (*Id.* at 152.) DLE bylaws permit multiple retests, but Deputy Klein testified most trainers would not permit it. (*Id.*)

Exhibit 5 documents all of the continuing narcotics training Duke and Officer Johnson undertook from February 20, 2017 (when Duke was first certified) until May 17, 2018 (i.e., about the time he was recertified). (*Id.* at 15.) Exhibit 5 contains no record of any training in July, September, or November 2017, or January or February 2018.

## C.    *Duke's Training Records*

Defense counsel requested Duke's training records, certifications, certification evaluations, and field reports. (Hr'g Tr. at 86-87; Ex. E.) The Government's attorney forwarded the email requesting records to Reserve Officer Moore, who is the Government's case agent in this matter. (Hr'g Tr. at 86.) Although the NPD also maintains deployment records for Duke, those records were not produced—not even for the search at issue in this case. (*Id.* at 48-49.) Reserve Officer Moore testified that he found records he thought might be responsive to the request for field reports. (*Id.* at 87.) This was a one-and-a-half page deployment log that was similar to the training reports

shown in Exhibit 5. (*Id.*) It contains information shown in Officer Johnson's report (Ex. 9) about the instant stop, as well as about Duke's other deployments for traffic stops. (*Id.* at 88.) The deployment log shows the NPD case number; the location of the incident; whether Duke was deployed; whether Duke indicated; and what, if anything, was found. (*Id.* at 88-89, 94.)

Reserve Officer Moore sought clarification from the Government's attorney about what to produce. (*Id.* at 87.) After his conversation with the Government's attorney, Reserve Officer Moore did not provide the deployment log in response to the initial email request because he "did not know what field reports meant at the time." (*Id.* at 89, 94-95.) Ultimately, the Government did not explain why the deployment records were not produced. Reserve Officer Moore testified:

> Q.    Okay. So you thought they would be responsive, but you had some conversation with her, and then you decided not to provide them?
>
> A.    I don't know why they didn't get provided. I know that I vividly recall e-mailing her back asking if by field reports you meant deployment logs or if they were—if they were two of the same thing or not, so I was trying to gather clarification on that.

(*Id.* at 96.) Reserve Officer Moore did not know whether Officer Johnson kept separate records for Duke. (*Id.* at 95.) The records produced did not show what substances Duke was actually certified on by MK9 in his initial training. (*Id.* at 42.) Officer Johnson testified he was told Duke was trained on marijuana. (*Id.* at 54.) Although records exist that show what drugs Duke was initially certified on by MK9, those records were not provided. (*Id.* at 42-43.) Officer Johnson attributed this to "an oversight." (*Id.* at 43.) In addition, although Duke is also used for tracking and area searches, the Government did not produce the records of this work. (*Id.* at 48.)

Officer Johnson was unable to estimate the number of total "working sniffs" Duke had done since he was acquired, although the deployment records would show them. (*Id.*

at 54.)  Officer Johnson was unable to state Duke's accuracy rate in real world situations. (*Id.* at 55.)

The training records that were produced show no instance of Duke performing poorly. (*Id.* at 61.)  Regarding Duke's remarkably effective performance shown in Exhibit 5, Officer Johnson explains their weekly training regimen, "[I]f he missed a hide or anything like that, we always brought him back and ended him on a good note, so there isn't any missed hides on here." (*Id.*)  Officer Johnson would "continue[] to work, and then we would put it down, that [Duke] found it." (*Id.* at 68.)  Duke had apparently missed "hides" but those are not shown on the records and there is no way to determine from his training records how often he did miss.  (*Id.* at 61.)  Due to the way the DLE K-9 Narcotic Training Report form is constructed, there is no way to determine whether a distractor was used in a test or if the dog failed to alert to the distractor.  (*Id.* at 63; Ex. 5.)  Officer Johnson was not able to explain how the "Response/Find" was graded, including why Duke was consistently marked "Fair" and "Average" on the same test. (Hr'g Tr. at 66-67; Ex. 5.)

Deputy Klein, who recertified Duke, stated it was his "reference" (perhaps "preference") to have a full set of records to know the training of the dog, if the dog has failed, and how the dog is progressing. (Hr'g Tr. at 136.)  Deputy Klein currently has a binder approximately 2 to 3 inches thick of all training records for his dog.  (*Id.* at 135.) He testified:

> Q.  So when you—well, let me just ask you, including all the training that that particular dog has done, including fails, it's important to keep, correct?
> A.  Yes.
> Q.  And without that, you don't know the validity of the dog, correct?
> A.  Outside the certification, no, you would not.

Q.      Right. But there's—the certification and the training needs to be kept
        up over the year?
A.      Correct.

(*Id.* at 164.)

## D.      *Midwest K-9 and Dogs for Law Enforcement*

Both MK9 and DLE are private companies. (Hr'g Tr. at 44.) Officer Johnson was unsure if MK9 or DLE had a "state certification" or "a national certification." (*Id.* at 41, 44.) It is not clear to me what counsel meant by such a "certification." However, there was no evidence presented that either MK9 or DLE has been licensed, registered, approved, or otherwise "certified" by any state or federal governmental body for their work with dogs. There was no evidence that either MK9 or DLE has been approved by any state or national *private* organization that presumes to "certify" the work of trainers or if such a process exists. It appears that neither the United States Government nor the State of Iowa provides standards for or certifies dog trainers, dog handlers, or individual dogs. (*Id.* at 139, 171.) Deputy Klein testified he did not believe there was any "national certification." (*Id.* at 138.) He did testify, however, that DLE had been "recognized by the State of Iowa courts in suppression hearings." (*Id.*)

DLE is a group that certifies dogs for its members, such as Officer Johnson. (*Id.* at 139.) DLE started as a nonprofit organization for replacing law enforcement dogs and in 2014 or 2015 evolved into a membership organization that certifies dogs. (*Id.* at 105, 158.) DLE has certified approximately 300 dog/handler teams in ten states. (*Id.* at 159.) DLE also provides accreditation for its trainers, including Deputy Klein, who is certified as a master trainer by DLE. (*Id.* at 106-07.)

## E.      *Hancock County Deputy Sheriff and K-9 Handler Andrew Klein*

At the hearing, the Government called Hancock County Deputy Sheriff and K-9 handler Andrew Klein. Deputy Klein was called for his expertise in dog training and

handling, as well as for his personal knowledge of Duke. Deputy Klein's credentials are shown on Exhibit 6. He has worked with and handled dogs in law enforcement since 2005. He has been training dogs since 2014. (Hr'g Test. at 101.) He has certified approximately 100 narcotics detection dogs. (*Id.* at 160.)

Deputy Klein testified regarding the four dogs he had trained individually, as well the class he hosted in the fall of 2018 that graduated five dogs. (*Id.* at 103-04.) Deputy Klein also works with DLE in their 40-hour training courses. (*Id.* at 107.) Deputy Klein initially trained with the International Police Work Dog Association ("IPWDA"). John Ivey broke away from IPWDA and started DLE in 2013 or 2014. (*Id.* at 106, 158.) Mr. Ivey reviewed Deputy Klein's resume and accredited him after observation and questioning. (*Id.* at 106, 139-40.) There do not appear to be any formal criteria or testing to become a master trainer with DLE. (*Id.* at 140.) Deputy Klein was not accredited by IPWDA. (*Id.* at 106.) Deputy Klein has never worked for MK9 or dealt with them directly, but he has dealt with dogs trained by MK9. (*Id.* at 107-08.) He opined that the detection work of dogs from MK9 is good. (*Id.* at 108.)

Deputy Klein worked with Officer Johnson and Duke at the May 2018 40-hour training course that resulted in Duke's recertification discussed above. (*Id.*) Duke passed four tests relating to odor detection, including the odor recognition, vehicle search, and building search tests. The odors Duke apparently was certified to detect include cocaine, heroin, methamphetamine, and marijuana.[8] Duke was given the "Narcotics Detection Certificate" shown in Exhibit 2 because he met the DLE's standards for a narcotics detection team.

Deputy Klein testified that dogs need to continue regular training or they could lose their skills. (*Id.* at 148.) DLE does not have a standard for the amount of on-going

---

[8] The record is not entirely clear regarding which substances Duke was imprinted on or trained to detect. Exhibit 4 indicates he passed a test for ecstasy also.

training required.  Deputy Klein testified that he believed the standard is "eight hours every two weeks, so four hours a week."  (*Id.* at 147.)  Duke's records show two hours for May 2018 (the month before the stop) and no training in June 2018.  (Ex. 5.)  After reviewing the video of the stop, Deputy Klein testified:

> Q.  I refer to where Duke is at kind of the back left of the truck as we're facing—or as we're looking from the camera perspective, you see him sit. Do you recall that part of the video?
> A.  Yes, sir.
> Q.  And that appears to you to be an alert, correct?
> A.  It is. He's disengaged himself from what the handler was doing at that time and starts working the odor around the taillight himself and on the rear area around the tailgate, even though the handler is trying to direct him to another area; he is working independently of the handler at that point and his response is typical with that of a positive drug alert.

(*Id.* at 242.)  Deputy Klein did not notice the driver's window was down at the time of the sniff.[9]  (*Id.* at 244.)

### F.  *Dog Trainer Jim Stenfeldt*

Defendant called Jim Stenfeldt, a professional dog trainer for thirty-five years, to offer his expert opinions regarding issues in the case.  (Hr'g Tr. at 167.)  Mr. Stenfeldt currently sells the dogs he has imprinted to law enforcement organizations.  (*Id.* at 168.)  Mr. Stenfeldt testified that there is no national or state certification or accreditation of dogs for drug detection.  (*Id.* at 171.)  Therefore, there is no mandatory minimum amount of training that is necessary for certification.  (*Id.*)  As a result, Mr. Stenfeldt believes the credibility of a dog is dependent upon thorough documentation of "every time that dog is out of the kennel and doing a job."  (*Id.* at 171-72.)  Mr. Stenfeldt believes that

---

[9] At 6:19 of Officer Johnson's body camera video, he asked Defendant to exit his vehicle.  (Ex. 7.)  It appears that he and Defendant are able to place their hands through the window opening and grab the door in a way that shows the window was clearly down.  The window appears to have remained down throughout the sniff.

the records of imprinting should be provided with the dog. (*Id.* at 172.) There were no such records offered in this case. Mr. Stenfeldt was also critical that the training reports and certification reports do not state how Duke is supposed to show an alert. (*Id.*) Mr. Stenfeldt offered criticism of the practice of allowing a dog to go home with a handler because it can lower the dog's work drive. (*Id.* at 173.) Mr. Stenfeldt was also critical of using electronic or shock collars with detection dogs. (*Id.* at 174.) Duke typically wears a shock collar, which Officer Johnson testified was for "obedience," but it is not clear if he was wearing one during the search in question. (*Id.* at 47.)

With regard to "cuing," Mr. Stenfeldt was critical of the practice of tapping on a vehicle because it unacceptably shows the dog where to search. (*Id.* at 176-77.) Based on his review of video of the traffic stop at issue in this case, he believes Duke was cued by Officer Johnson tapping Defendant's vehicle, including a tap on the pickup's tailgate, before Duke jumped up. (*Id.* at 179-80.) Mr. Stenfeldt criticized the practice of telling Duke, "Good boy," during the search of the pickup because it was a distraction. (*Id.* at 180.) Regarding Duke's alert, Mr. Stenfeldt testified as follows:

> Q. Did you see any behaviors in the video from the dog at any time that would indicate to you that he detected the presence of any narcotics?
> A. No. The sit at the end of the vehicle, there was definitely a sit, but I question whether or not it was an indication of scent of narcotics. If he—if it had been, the dog should have worked that scent cone back to the point of origin and given a more defined scent instead of 10 feet out of where the perceivable scent cone would have been. So the actual—a good, legitimate indication would have been at the driver's door where the dog jumped up there. That would have been the strongest point of egress for the odor, not 10 feet away at the back of the truck.

(*Id.* at 180-81.) Essentially, Mr. Stenfeldt believed Duke's alert, if there was one, should have occurred near the driver's side window because it was open and nearest where the drugs were ultimately recovered and where the odor should have been the strongest. (*Id.*

at 181-82, 186.)  Mr. Stenfeldt also testified that he had difficulty seeing or hearing any closed-mouth breathing that would be indicative of an alert to drugs.  (*Id.* at 183.)  Mr. Stenfeldt expressed an opinion that there was a "possibility" that Duke was praised or encouraged too much during the search, which can cause a dog to give the desired reaction to get a reward.  (*Id.* at 184-85.)  Mr. Stenfeldt opined that Duke was not working independently of his handler.  (*Id.* at 188.)  Mr. Stenfeldt testified that he did not see Duke rewarded after he sat and that he trains his dogs to sit until released with a reward.  (*Id.* at 185-86.)

Mr. Stenfeldt was also critical of using confiscated drugs and storing drugs in glass jars when using real drugs for dog training purposes.  (*Id.* at 178.)  Additionally, Mr. Stenfeldt expressed the opinion that all of a dog's actual deployments should be documented and examined.  (*Id.* at 179.)  Mr. Stenfeldt criticized Duke's records because they do not show how Duke is supposed to alert and do not show how Duke performed in real world deployments.  (*Id.* at 188-89.)  Mr. Stenfeldt testified that Exhibit 5 seems to show that Duke is one hundred percent accurate when, in fact, Officer Johnson testified that he did not document any negative responses.  (*Id.* at 189.)  Ultimately, Mr. Stenfeldt concluded that Duke's alert or sit during the traffic stop was "very subjective."  (*Id.* at 190.)

On cross exam, the Government raised a number of issues to challenge Mr. Stenfeldt's credibility.  Mr. Stenfeldt has been or will be paid $1200 for his work on this case.  He has testified eight times in the last year and only testifies for defendants.  His resume is not up-to-date because, among other things, "International K-9 Operations" no longer exists.  (Ex. A.)  He has never been in law enforcement, although he has trained and used drug detection dogs in the field.  Mr. Stenfeldt is a high school graduate who calls himself a master trainer.

Mr. Stenfeldt admitted that safety reasons could preclude immediately rewarding a dog. (Hr'g Tr. at 202.) He also admitted that the DEA has not registered or approved his dog training, as his resume may imply. (*Id.* at 205-06; Ex. A.) Rather, the DEA has licensed him in the past for handling of contraband necessary to train dogs. (Hr'g Tr. at 205-06.)

Mr. Stenfeldt asserted that Duke was cued to sniff by the rear license plate. However, he admitted that Duke sniffed "over the top of the cab[10] and then down along the seam between the tailgate and the brake light," before sitting rather than at the point Officer Johnson was allegedly cuing. (*Id.* at 231-32.) He admitted that Duke appears to sit at 10:14 of Exhibit 8. (*Id.* at 232.)

## G.    *Cuing*

"Cueing is a direct action, utterance, or something similar to that elicits a false alert out of the K-9 for the purpose of being able to search the vehicle." (Hr'g Tr. at 241.) Cuing occurs when the actions of the handler cause his dog to alert. (*Id.* at 72.) Officer Johnson recognized "cuing" is inappropriate because the dog is supposed to work independently and not alert in response to signals from his handler. (*Id.* at 72-73.) While all of the witnesses seemed to agree that cuing is undesirable, much of the testimony on this issue focused on what constitutes improper cuing and whether, in fact, Officer Johnson's actions cued Duke to alert.

Deputy Klein testified that the manner in which Officer Johnson motioned with his hand or tapped the pickup was not concerning and was consistent with how he teaches. (*Id.* at 126.) Jim Stenfeldt distinguished between cuing and detailing:

> Q.    You just used a phrase I'm interested to explore with you, directed to sniff. How do you direct a dog to sniff?

---

[10] Given the context and location of the alert, it seems likely Mr. Stenfeldt misspoke and meant to say the "bed" rather than the "cab" of the pickup.

A.  With your hand gestures, going around a vehicle, tapping on the sides of the vehicle; basically, tapping where you want the dog to sniff.

Q.  So, sir, you can tap on a vehicle where you want the dog to sniff, correct?

A.  Yes.

Q.  Okay. You can also gesture?

A.  Yes.

Q.  Without actually making physical contact with the car?

A.  Uh-huh.

Q.  Sorry, is that a yes?

A.  Yes.

Q.  And that is often, if I'm using the lingo here correctly, called detailing?

A.  Yes.

Q.  And it is not cueing?

A.  It can be construed as cueing.

Q.  Construed by whom?

A.  Anyone viewing the video. If it's excessive, it's cueing. If you need to direct the dog back to the vehicle with a tap here or a tap there, that's fine.

.   .   .

Q.  So to distinguish between cueing and detailing, would it be fair to say that cueing is essentially eliciting a response from the dog?

A.  Yes.

Q.  Like an alert or indication?

A.  Yes.

Q.  And that is different from detailing when you are just trying to get the dog to sniff a certain area?

A.  Yes.

.   .   .

Q.  So if it's excessive, over and over and over again, do you believe that changes to cueing?

A.  Yes.

Q.  Okay. So a small amount, if the dog gets distracted, is normal but doing it over and over, you believe is cueing?

A.  Yes.

(*Id.* at 211-12, 215, 226.)  Mr. Stenfeldt also testified other things could have caused Duke to alert to other than the presence of narcotics, including a desire to please his handler.  (*Id.* at 228.)

## III.    ANALYSIS

### A.    *The Parties' Arguments*

Defendant urges several arguments to support his contention that the officers lacked probable cause to search and seize his vehicle either before or after the dog sniff occurred.  Defendant argues that prior to the dog sniff, there was no basis for a reasonable person to conclude that there was "a fair probability that contraband or evidence of a crime" would be found in the pickup. *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006). The Government does not apparently contest this assertion.  Therefore, the existence of probable cause to search the pickup must rely on Duke. Defendant contends that Duke's reliability has not been established to warrant such reliance.  Defendant cites the Government's failure to provide existing documents, including Duke's deployment records, in discovery.  (Doc. 31 at 5-6.)  He argues that without these records, it is impossible to determine whether Duke had performed a roadside sniff before, much less whether there had been prior false positives.  (*Id.* at 10.)

Defendant also challenges the failure to maintain records relating to Duke's early training (i.e., records that would establish what drugs he was certified to detect). Regarding Duke's initial certification, Defendant argues that the certificate itself is a meaningless piece of paper without supporting documentation or testimony that establishes how Duke was certified, whether MK9 is a bona fide organization, and MK9's standards for certification.

With regard to the DLE certification, Defendant argues that the "certification" is suspect because dogs are permitted to re-test and such failure was not documented.

Defendant objected to the absence of standards and manuals regarding DLE certification, as well as the absence of proof that DLE is a "bona fide organization."

Defendant also argues that the lack of standards and records regarding Duke's training and deployment do not support a finding that he is credible. Similarly, Defendant argues that the records that were produced regarding Duke's training are suspect because his trainer did not document Duke's failures. Rather, Officer Johnson would take Duke back through the training area he missed until Duke found the hidden contraband. (Hr'g Tr. at 61.)

Finally, Defendant asserts that Duke's alleged alert is suspect because of the dog's behavior at the time of the sniff, the behavior of his handler, and the lack of deployment records showing how Duke alerted in the past. (Doc. 31 at 10-11.) Because of this, he contends the Government cannot show how Duke's behavior objectively demonstrated the presence of drugs to amount to probable cause. (*Id.*) (citing *United States v. Heir*, 107 F. Supp. 2d 1088, 1091, 1095 (D. Neb. 2000)).

The Government responds that Duke's alert was reliable because he was sufficiently trained and his alert was consistent with that training. The Government contends both MK9 and DLE are bona fide organizations and that Deputy Klein, the trainer who most recently certified Duke, testified that Duke was reliable in a controlled setting. The Government contends that Officer Johnson did not improperly cue Duke to alert and that Duke independently alerted near the brake light. (Doc. 32 at 4-6.) The Government's post-hearing brief makes no mention of the failure to produce records regarding Duke that were requested in advance of the hearing.

**B.      The Warrantless Search of Defendant's Vehicle**

**1.      The Automobile Exception**

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches are *per se* unreasonable, with a

few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41. "Probable cause is determined by the totality of the circumstances, and exists when the facts are sufficient for a reasonable person to believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)). If probable cause justifies the search of a vehicle, then it permits the search of every part of the vehicle and its contents that may conceal the object of the search. *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (citing *United States v. Roos*, 456 U.S. 798, 825 (1982)).

### 2.    *Was There Probable Cause to Search the Vehicle Before the Sniff?*

The Government does not assert that there was probable cause to permit the search of the pickup other than as supported by Duke's alert. I agree that there was nothing to give the officers probable cause to believe Defendant's vehicle contained contraband prior to Duke's alleged alert.

### 3.    *Did the Sniff Establish Probable Cause?*

#### a.    *Applicable Standards*

A dog sniff of the exterior of a vehicle during a stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (holding that the positive indication of a reliable drug dog, alone, is enough to establish probable cause). A drug

dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *Olivera-Mendez*, 484 F.3d at 512 (citation omitted). The standard to establish probable cause "is no more demanding where police search an automobile based on probable cause without a warrant." *Id.* However, the court must also consider evidence that may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013).

### b.     Did Duke alert?

I find that Duke alerted at approximately 9:47 of Exhibit 7 immediately after sniffing above the tailgate on the driver's side of the pickup. I see no reason to doubt Officer Johnson's interpretation of this behavior as Duke's alert. The line between "detailing" and "cuing" is far from bright, but I am persuaded that Officer Johnson's actions were intended merely to focus Duke's attention on the car. Duke seemed to require a significant amount of encouragement to stay on task whether because of his "hyper" or energetic nature or because of the distractions at the scene. (Hr'g Tr. at 31.) Ultimately, it appears to me that Duke alerted independently and not in response to some cue from Officer Johnson.

Defendant and his expert attempt to cast doubt on whether Duke alerted by pointing out that Duke's records fail to describe the manner that Duke alerts. Officer Johnson's testimony regarding how Duke has been trained to alert is corroborated by Deputy Klein who witnessed his performance at the May 2018 recertification: Duke sits. On a related issue, Defendant criticized the failure to reward Duke immediately after the alert. This

supposed failure could be significant in two ways. First, if Duke was not routinely rewarded immediately after an alert, it could, in theory, undermine his training regimen and his reliability. In this case, there is no evidence of a breakdown of this nature. This is one more reason that records are crucial to Duke's reliability, but there is no evidence to believe this one instance of a late reward casts doubt on Duke's alert. Second, the supposed failure to immediately reward Duke may indicate that Officer Johnson did not interpret Duke's sit as an alert. However, Officer Johnson acknowledged the alert immediately afterward when he asked Defendant, "What's in that bed, Dude?" (Ex. 7 at 9:50.) The fact that Officer Johnson completed the search of the vehicle before returning Duke to the safety of the police vehicle before rewarding him does not undermine the fact of the alert in this case. Moreover, Deputy Klein testified that it is common to wait to reward a dog until the dog is safely inside the squad car after a roadside sniff. (Hr'g Tr. at 161.)

Nevertheless, the issue in this case is not so much whether Duke alerted but whether that alert is sufficiently reliable to find probable cause to believe contraband was present. Much of Defendant's criticism about how the search was conducted, including the alleged cuing; the fact that Duke alerted to the bed of the pickup rather than the cab; and the "late" reward of Duke all relate to whether the alert is a reliable indicator of the presence of narcotics. More specifically, the absence of records about Duke's training and field performance magnify issues that might otherwise be unconcerning.

### c.   *Duke's Certification*

The Supreme Court has rejected a rigid, bright-line, evidentiary checklist based on in-the-field "hits" or "misses" in determining if a drug detection dog was reliable. *Harris*, 468 U.S. at 245. Rather, *Harris* determined "the better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.* at 246. In explaining what is necessary to prove a dog's reliability the Court stated:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Id.* at 246-47. The *Harris* Court did not define what constitutes a "bona fide" dog certification organization.

"'Bona fide' has many applications in the law (e.g., bona fide purchaser, bona fide occupational qualification)." *Griffin v. Lockhart*, 935 F.2d 926, 929 n.2 (8th Cir. 1991) (citing *Black's Law Dictionary* (6th ed. 1990); Brian Garner, *A Dictionary of Modern Legal Usage* 90-91 (1987)). "In each application it is generally used according to its dictionary definition—that is, meaning '[a]cting or done in good faith; sincere, genuine.'" *Id.* (quoting *Oxford English Dictionary* (2d ed. 1989)); *See also Lowe v. S.E.C.*, 472 U.S. 181, 207 (1985) (defining "bona fide newspapers"). *Black's Law Dictionary* defines "bona fide" as "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine." *Black's Law Dictionary* (10th ed. 2014).

In *Harris*, the State introduced substantial evidence of the dog's training and proficiency in finding drugs. *Id.* at 248. The dog in *Harris* had successfully completed two separate training programs, a 120-hour program and an additional 40-hour program. *Id.* He had also been certified by an independent company, but by the time of the vehicle search at issue, the certification had expired. *Id.* There was documentation that the dog and his handler trained four hours per week with exercises designed to maintain their skills. *Id.* The testimony and written records confirmed that the dog always performed at the highest level during those training sessions. *Id.* Because of this, the Court held that the dog was "a reliable detector of drugs." *Id.* at 249.

The evidence presented regarding Duke's certification is less impressive than the evidence presented in *Harris*. In fact, the Court was offered very little information about MK9. Based on the record before me, I cannot conclude that MK9 is a "bona fide organization." It may well be, but I was provided with insufficient information to reach that conclusion. *See United States v. Diaz*, No. 2:16-cr-00055-DCN, 2018 WL 1697386 at *18 (D.S.C. Apr. 6, 2018) (declining to find police dog training and certification center was a bona fide organization when the government provided no evidence about the center's certification because "to do so would be to abdicate [the court's] responsibility under *Harris* to evaluate a dog's reliability").

In contrast, DLE appears to be a bona fide organization for certifying dogs for drug detection. This Court has previously accepted certification of a DLE dog after reviewing its bylaws and certification rules. *See United States v. Herbst*, No. 17-CR-4059, 2018 WL 445532, at **2, 5 (N.D. Iowa Jan. 16, 2018). In this case, however, the Government did not offer DLE's bylaws or certification rules, which might have better explained the policies, standards, and procedures applicable to certification.[11] Nevertheless, it appears that DLE operates in several states, has many members, has certified hundreds of dogs, and takes pains to vet its master trainers who actually certify the dogs. (Hr'g Tr. at 106-07, 159.) It appears DLE was organized and operates in good faith, sincerely and not fraudulently for the purpose of certifying drug detection dogs. Moreover, having heard Deputy Klein describe his background and reviewed his resume, I conclude he is credible and is qualified to administer the vehicle search test that Duke passed and that is most germane to this matter. (Ex. 4, 6.) Therefore, I conclude DLE is a bona fide organization for certifying drug detection dogs.

---

[11] Because those bylaws and certification rules are not part of the record in this case, I have not relied on them other than to note that *Herbst* shows they exist and *Herbst* accepted an alert from a DLE certified dog.

Duke was certified by DLE approximately one month prior to the stop in question. While Defendant takes issue with the procedures and manner of the certification (e.g., the possible aging of drug samples, the storage of drugs in jars, allowing dogs to wear electronic collars, permitting retakes, etc.), I find nothing about the DLE certification process that makes me conclude that it is not a "bona fide organization" or that Duke's successful completion of the tests in a controlled setting is insufficient to afford his alert the presumption in favor of probable cause afforded by *Harris*. However, my analysis does not end with that presumption.

> *Harris* explicitly permits a defendant to challenge the reliability of a certified dog:
>
> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. See Tr. of Oral Arg. 23–24 ("[T]he defendant can ask the handler, if the handler is on the stand, about field performance, and then the court can give that answer whatever weight is appropriate").

*Harris*, 568 U.S. at 247.

For the reasons discussed below, I find that Defendant has overcome the presumption that Duke's alert established probable cause for the search.

### d. The presumption of reliability based on certification was undermined.

The case for probable cause to search Defendant's vehicle is undermined by an accumulation of factors that ultimately cast real doubt on the credibility of Duke's search. *See Harris*, 568 U.S. at 244 (requiring courts to look at the totality of the circumstances

when determining if probable cause existed for a search). I see no single outstanding fact, no one silver bullet, that makes me conclude that probable cause was lacking. It is not the performance of Duke and his handler at the time of the search so much as the lack of attention to the administrative details of his training and deployment that calls this alert into question.

### i. The absence of standards or policies regarding NPD Dogs

Duke was the first drug dog for the City of Nashua Police Department and for Officer Johnson. I see little evidence of any formal policy by the City or Officer Johnson establishing requirements for any aspect of the use of dogs in detecting drugs. There is not, so far as I can tell, any established policy for the type of dogs to be used, the drugs they are to be trained to detect, how they are to be trained, where they are to be housed, how often they are to be certified, which organizations are permitted to certify the dogs, when and how they are to be trained, when and how they are to be deployed, when and how they are to be retired, what standards they are to be held to (e.g., failure rates), and what records are to be kept regarding the dogs. Rather, it appears that all of these decisions were left entirely to the discretion of Officer Johnson who, for example, testified he would "go by" a training standard he learned from his trainer. (Hr'g Tr. at 69.)

Nothing about *Harris* or other relevant case law *requires* any law enforcement agency to adopt any of these policies. I also note the witnesses generally agreed that there are no national or state standards applicable to drug detection dogs. However, the absence of clear expectations by the law enforcement agency that employs a drug dog and handler makes it exceptionally difficult to objectively assess the credibility of a particular alert. *See contra United States v. Gastelo-Armenta*, No. 8:09CR92, 2010 WL 1440451 at *3 (D. Neb. Jan. 21, 2010) (dog training program conducted in accordance with Omaha Police Department and Nebraska State Patrol police dog standards and

policies).  The failure to adopt one or more policies regulating the NPD's dog handling program is not, by itself, determinative.  However, the absence of any sort of policies by which it regulates its dog handling team or any rubric by which the NPD evaluates them, is a factor that adversely affects a finding that probable cause existed.

### ii.    The absence of records

I find the absence of records the most troubling challenge to Duke's credibility. Some of Duke's records are absent because Officer Johnson recorded or kept relatively little data.[12]  In contrast, the training records for Deputy Klein's dog amount to a book that is two to three inches thick.  (Hr'g Tr. at 135.)   The Government produced only 28 pages regarding Duke's training and certification.  (Ex. 1-5.)  While I do not believe that measuring or weighing the records is a particularly helpful means of divining credibility, the relative paucity of records is striking.

Records regarding how and upon what drugs Duke was imprinted before he was adopted by the City of Nashua were not maintained.  Testimony was disputed regarding whether it is common or necessary to maintain these records. The absence of these records, alone, would not be enough to undermine Duke's credibility.  However, it engenders some questions about Duke's background and becomes part of the accumulation of doubt about his credibility.

More troubling is the absence of any record of Duke's failures. The training records that were produced show no instance of Duke performing poorly.  (Hr'g Tr. at 61.)  Officer Johnson explains this as follows, "[I]f he missed a hide or anything like that, we always brought him back and ended him on a good note, so there isn't any missed

---

[12] Nothing about this opinion is intended as a criticism of Officer Johnson. I conclude he testified honestly and candidly in response to all questions.  As the city's first dog handler, he might have been tasked with creating a K-9 program for a small department out of whole cloth without a framework that fully considered the evidentiary aspects of drug detection by dogs.

hides on here." (*Id.*) Deputy Klein, who recertified Duke, stated it was his "reference" (perhaps "preference") to have a full set of records to know the training of the dog, if the dog has failed and how the dog is progressing. (*Id.* at 136.) The witnesses agree that no dog is one hundred percent accurate.

Officer Johnson's choice not to record Duke's failures but continue to train until he found the hidden drugs makes it impossible to determine anything about his success rate, even in controlled situations. Moreover, the one concerning comment on Duke's May 2018 recertification form was, "Trust the dog!" As Deputy Klein explained, this meant Officer Johnson seemed reluctant to believe Duke when he did not alert. This comment, coupled with a training regimen that apparently allowed Duke to keep trying until he found a missed hide, casts some doubt on Duke's credibility in the field. In the absence of records of failures in controlled situations, Deputy Klein's concern about "trust[ing] the dog" is magnified by the practice of continuing to train until Duke finds hidden drugs. The practice of ending on a "positive note" may well be a valid training practice. In this case, however, it raises the concern that Duke may be alerting to complete the exercise and obtain his reward, not because drugs are present. The lack of records and this particular training practice seem to invite criticism about Duke's performance.

I also have concern about the complete absence of training records for July, September, or November 2017, and January and February 2018. While there is no national standard for required training hours, Deputy Klein and Officer Johnson seem to accept a standard of 16 hours per month.[13] Deputy Klein explained why, in practice, dogs may receive as little as two hours of narcotics training per month. (*Id.* at 148.)

---

[13] Deputy Klein testified training should be "eight hours every two weeks, so four hours a week." (Hr'g Tr. at 147.) Officer Johnson said sixteen hours per month is the standard he goes by. (*Id.* at 69.)

However, the K-9 Narcotic Training Reports in Exhibit 5 show that Duke did not receive even two hours of training in July, September, and November 2017, as well as in January, February, and March 2018. (Ex. 5.) I have no reason to doubt Officer Johnson's credibility regarding the amount of Duke's on-going training. I also see no basis in the record to criticize the hourly standard to which he trains. However, the records for any training that may have occurred during at least five of those months are wholly absent. Deputy Klein testified it is important to maintain all training records to know what a dog is doing on a daily basis. (Hr'g Tr. at 148.) The doubt about what detection training Duke received in those months and how he performed adversely affects my perception of his reliability.

Other records are absent because the Government and/or the police department failed to provide them as requested. The department has a deployment log that details how Duke has responded on other stops, including whether he was deployed, whether he alerted, and whether drugs were found. (*Id.* at 88-89.) This information could be used to determine how often, and perhaps under what conditions, Duke failed in actual deployments. I do not know if Duke had successfully identified drugs in a real-world sniff before this sniff or if he had even previously been deployed at night on a busy highway with noises and smells to distract him. I do know that Duke had been deployed approximately 68 times by the time Defendant was stopped (*Id.* at 11), but I know nothing about either the conditions at the time of those deployments or Duke's performance during those deployments. While *Harris* deemphasized the importance of actual deployments in comparison to training situations, the information is still relevant and should have been produced to Defendant. *See* 568 U.S. at 247 ("Evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant.").

On a motion to suppress evidence, "the burden of proof is on the defendant who seeks to suppress evidence," and the burden is "on the government to justify a warrantless search." *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984); *see also United States v. Hughes*, 517 F.3d 1013, 1019 (8th Cir. 2008) (the government bears the burden to justify a warrantless search). The Government bears the burden of proof regarding Duke's credibility. The absence of records leaves the Court with unanswered concerns regarding what facts in these records might reflect adversely on Duke's reliability. I conclude that the failure to provide Duke's deployment records is not harmless. *See United States v. Thomas,* 726 F.3d 1086, 1088 (9th Cir. 2013) (the court could not say there was "nothing in [redacted dog training] documents that would have changed the ultimate determination that the agents had probable cause to support their search" of vehicle based on dog sniff, and thus district court's failure to suppress documents was not harmless error) (quotation omitted); *United States v. Flores,* No. 2:16-cr-0833-CAS, 2017 WL 2056018 at *7 (C.D. Cal. May, 8, 2017) (Federal Rule of Criminal Procedure 16 and Ninth Circuit precedent required the production of narcotics dog's field performance records).

The Court should not be left to speculate about what those records show or how Defendant may have used them to question Duke's credibility. The relevant inquiry requires consideration of Duke's overall record to determine whether his narcotics-detection skills are trustworthy. *Herbst*, 2018 WL 445532 at *7. Weighing all the evidence, I find that the deficiencies in the training records that were provided, as well as the failure to provide existing records, support the conclusion that Duke's sniff in this case was unreliable.

Mr. Stenfeldt's testimony figures into my analysis, although the Government cast doubt on his credibility and he has not persuaded me regarding all of the reasons he was skeptical of Duke's alert. I do not accept his conclusion that Officer Johnson cued Duke

to alert. Similarly, I cannot definitively conclude that Officer Johnson praised Duke too much or did not allow him to work independently, as Mr. Stenfeldt concluded. Whether an officer's behavior crosses from permissible "detailing" to impermissible "cuing" is a matter of degree and varies from dog to dog.

Even if I do not agree with all of Mr. Stenfeldt's ultimate conclusions, his testimony highlights the importance of record-keeping and my larger concern regarding the proof of Duke's reliability. Except in the most obvious cases, it could be very difficult to observe a single sniff and conclude the dog was improperly cued. However, in the absence of records showing how the dog and handler perform together and the dog's success rate over time, the continual efforts to focus Duke's attention appear more suspicious. If, for example, we knew that Duke located drugs in X% of his deployments (or training exercises) and Officer Johnson testified that this amount of detailing was consistent with his usual practice, finding probable cause based on his alert would be more straightforward. Given the paucity of records regarding Duke, the amount of detailing is part of the totality of the circumstances that makes me question the reliability of the alert.

Mr. Stenfeldt's testimony about the scent cone raises a similar concern. I am not persuaded by his ultimate conclusion, but the location of the alert is concerning under the circumstances. There is a superficial appeal to the notion that Duke should have alerted to the actual drugs in the cab rather than alert to the bed where no drugs were found. Nevertheless, Duke's alert is not unreliable merely because Mr. Stenfeldt thinks the scent should have been strongest at the driver's window, not at the rear of the pickup. *Harris* pointed out:

> if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer

to locate. Or the dog may have smelled the residual odor of drugs previously
in the vehicle or on the driver's person.

*Harris*, 568 U.S. at 245-46.

As the Government argues, Duke may have alerted to a residual odor of drugs in the rear of the vehicle. Indeed, *Harris* rejected field-performance records as the "gold standard" because the vagaries of real-world situations may not capture a dog's false negatives and overstate a dog's false positives. *Id.* at 246. While it is impossible to know whether Duke alerted to residual odor in the rear of the pickup, the absence of Duke's field performance records magnifies the significance of where and when Duke alerted. As such, this fact weighs against a finding of probable cause in my assessment of the totality of the circumstances.

## IV.   CONCLUSION

Based on the above, I find that Defendant's Fourth Amendment rights were violated on June 10, 2018. When viewing all of the facts surrounding Duke's alert through the lens of common sense as required by *Harris,* I conclude that a reasonably prudent person would not "think that a search would reveal contraband or evidence of a crime." 568 U.S. at 248.

**Therefore, I respectfully recommend that Defendant's Motion to Suppress (Doc. 7) be GRANTED.**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure

to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** at Cedar Rapids, Iowa, this 4th day of February, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa